# United States Court of Appeals
## For the First Circuit

No. 11-2231

ASHOT GASPARIAN; VERGINE GASPARIAN; HAIK GASPARIAN,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and Woodlock,[*] District Judge.

Randy Olen on brief for petitioners.
Sabatino F. Leo, Office of Immigration Litigation, Civil Division, Department of Justice, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Anthony P. Nicastro, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

December 3, 2012

---

[*]Of the District of Massachusetts, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.    Petitioners Ashot Gasparian, Vergine Gasparian[1] and Haik Gasparian[2] are citizens and natives of Armenia who were ordered removed from the United States following the denial of their asylum claim in 1997.  They have resided in the country since.  Last year, they filed a motion to reopen their asylum claim; the Board of Immigration Appeals ("BIA") denied this motion, and the petitioners brought a timely appeal to this court. We begin by briefly discussing the factual background of the Gasparians' initial asylum claim.

Ashot and Vergine Gasparian are husband and wife who were each born in Yerevan, Armenia, in 1950 and 1952, respectively. They were married in 1979, and their son Haik Gasparian was born in Yerevan, Armenia, in 1989.  As Ashot Gasparian testified before an immigration judge, he ran a business in Armenia that sold shoes and slippers.  Between 1976 and 1978, Ashot Gasparian did business with an Azerbaijani man that involved travels to Azerbaijan.  Armenia had a tense relationship with Turkey, and many Armenians perceived the Azerbaijani people as being close to Turkey.

---

[1]In most documents in the record, Vergine is referred to by her maiden name of Djirdjian or Djirdjiak.  Because she identifies herself as Vergine Gasparian in her brief to this court, we refer to her by that name.

[2]The record contains some alternative spellings for Haik Gasparian's name, such as Halik or Hiak, but Haik appears to be the preferred spelling, and that is the spelling he uses in the brief to this court.

Ashot Gasparian testified that for years, he was threatened by Armenians who were upset at him for his business dealings with an Azerbaijani man, even after those business dealings ended. These threats took the form of phone calls (including some in the middle of the night) and knocks on his door, although his family apparently never met those who were making the threats face to face. The threats were to beat or harm Ashot Gasparian, and after Haik Gasparian was born, they threatened to kidnap Haik.

Ashot Gasparian complained to the police once, but the police indicated they could not stop the threats. Ashot Gasparian closed his business, and the family moved to a new neighborhood in 1990 or 1991; they received two or three threatening phone calls at their new residence, but no knocks on their door. None of the family members was ever physically harmed. However, in 1992, Vergine and Haik Gasparian entered the United States on visitor visas and Ashot Gasparian did so in 1993.

Each overstayed and Ashot Gasparian admitted that return to Armenia was never intended. The Gasparians settled in Rhode Island. Since around 1995 or 1996, Ashot Gasparian and his wife have been employed at a jewelry company. Haik Gasparian attended Rhode Island public schools, graduated from high school, and is now enrolled in college; he also works as a cook at a pizza restaurant.

In December 1994, Ashot Gasparian filed a request for asylum and withholding of removal on behalf of himself, his wife, and his son. Although the initial asylum form contained a false story that the family was persecuted because Vergine Gasparian was Azerbaijani, Vergine Gasparian stated in an affidavit that the false asylum application was filled out by a lawyer in California, and that Ashot Gasparian was unaware of the falsehoods because he did not speak or read English. At the hearing, both testified to the facts stated above.

On November 7, 1995, the Immigration Judge ("IJ") denied the Gasparians' applications for asylum and withholding of removal. The IJ expressed doubt about the claim of harassment through the early 1990s for business activities ending in 1978 but concluded in any event that the threats did not lead to harm nor were the threateners connected to the government. The Gasparians appealed to the BIA but gave no substantive reasons and filed no brief, so the appeal was summarily dismissed in March 1997, with the BIA allowing 30 days for voluntary departure. The Gasparians filed a motion to reopen their proceedings in January 1998, but the BIA dismissed the motion as untimely.

The Gasparians ignored the BIA's order to depart and continued living in Rhode Island undisturbed until, in May 2011, they filed a second motion to reopen their proceedings along with renewed applications for asylum, withholding of removal, and relief

under the Convention Against Torture ("CAT"). Their motion, citing news articles about increasing diplomatic and military tensions between Armenia and Azerbaijan, argued that the potential for war constituted changed circumstances making it more likely that the Gasparians would be persecuted for perceived sympathy to Turks and Azerbaijanis; the motion also noted that the 2009 State Department Human Rights Report for Armenia indicated widespread human rights abuses.

In September 2011, the BIA denied the motion to reopen. The BIA stated that the Gasparians had shown changed circumstances in Armenia, but they had not shown that those changes would be material to their claims. The BIA noted that Ashot Gasparian's dealings with Azerbaijanis had ended over thirty-two years ago, and there was no indication that Armenians were still interested in harassing his family after eighteen years living in the United States. The Gasparians brought a timely appeal to this court.

Motions to reopen ordinarily must be filed within ninety days of the BIA decision, 8 C.F.R. § 1003.2(c)(2) (2012), but they can be filed later if supported by previously unavailable information showing material changed circumstances, id. § 1003.2(c)(3)(ii); Raza v. Gonzales, 484 F.3d 125, 127 (1st Cir. 2007). But the new evidence "must, at a bare minimum, establish a prima facie case sufficient to ground a claim of eligibility for the underlying substantive relief." Le Bin Zhu v.

-5-

<u>Holder</u>, 622 F.3d 87, 92 (1st Cir. 2010) (internal quotation marks omitted).  Here, the BIA's assessment was within its authority and was neither arbitrary nor flawed by any error of law.  <u>See</u> <u>Aponte</u> v. <u>Holder</u>, 683 F.3d 6, 10 (1st Cir. 2012).

The possibility of war between Armenia and Azerbaijan was speculative and, even if tensions might enhance the likelihood of harm to perceived sympathizers of Turkey and Azerbaijan, the old threats against petitioners lay over thirty years in the past and they had been absent from the country for almost twenty.  The BIA was not required to suppose that the threats were now likely to be renewed let alone that they would be translated into action amounting to persecution.[3]  The new evidence gives no substantial support to asylum, withholding of removal or CAT relief.

The Gasparians request that even if the denial of their motion to reopen is upheld, we "issue an order directing the Government to state whether it will exercise its prosecutorial discretion . . . to cancel or otherwise terminate the removal proceedings against this family." Appellants' Br. 7.  They rely primarily upon a June 2011 memorandum, known popularly as the

---

[3]Nor does the State Department report indicate that the Gasparians will be singled out.  <u>Meguenine</u> v. <u>INS</u>, 139 F.3d 25, 29 (1st Cir. 1998) ("[G]eneral fears (even 'well-founded' ones) of future harm from political upheaval or terrorist violence are not sufficient to establish eligibility for asylum . . . .").

Morton Memo,[4] which lists various factors that immigration officials should consider in deciding whether to refrain from bringing proceedings against or removing aliens. Although the immigration statutes do not confer jurisdiction on this court to review acts of prosecutorial discretion, Immigration and Nationality Act § 242(g), 8 U.S.C. § 1252(g) (2006), we have sometimes asked the government to advise us of its intentions one way or the other.

Ashot and Vergine Gasparian appear to be sympathetic candidates, having lived here for a good many years, with Vergine Gasparian's sister's family living in Rhode Island as permanent residents, and with stable employment and nothing that would necessarily prevent an exercise of prosecutorial discretion in their favor. But they also fit none of the categories identified in the Morton Memo as warranting "prompt particular care and consideration." Morton Memo, supra, at 5.

Our inquiries have, in the past, been limited to cases where the exercise of discretion seemed reasonably likely, such as for aliens who entered the country as children or who have

_____

[4]Morton, Dir., U.S. Immigration & Customs Enforcement, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

dependent United States citizen children.[5]  Making these inquiries routine would not only add to delay but deprive them of any significance.   Of course, since the 1997 removal order, the government has taken no action to physically remove Ashot and Vergine Gasparian.  It might seem peculiar to alter the status quo because they voluntarily sought further relief, presumably hoping to regularize their status.  Nothing prevents the government from providing the forbearance they now seek.

Haik Gasparian has a more promising chance for relief under the Morton Memo, having entered the United States as a young child and pursued his education in this country, and being beyond blame for remaining in the country despite the BIA's removal order. He may also qualify for deferred action under a new program announced in June 2012 for immigrants who meet certain conditions including entry into the country as children, schooling or military service, and lack of a serious criminal record.  Consideration of Deferred Action for Childhood Arrivals Process, U.S. Citizenship & Immigration Servs., http://www.uscis.gov/childhoodarrivals (last updated Sept. 14, 2012).

This new June 2012 program, although seemingly tailored for individuals like Haik Gasparian, requires an application by

---

[5]See, e.g., Order, Sierra-Pena v. Holder, No. 11-1585 (1st Cir. May 22, 2012); Order, Ni v. Holder, No. 11-1518 (1st Cir. Feb. 14, 2012); Order, Arriaza v. Holder, No. 10-1532 (1st Cir. Jan. 24, 2012); Order, Arevalo v. Holder, No. 10-2483 (1st Cir. Dec. 12, 2011).

him, and acceptance of an applicant depends on an exercise of discretion. Although the BIA's refusal to reopen must be <u>affirmed</u>, we will <u>stay the mandate as to Haik Gasparian for 90 days</u> to allow him to apply for relief; although we cannot order the government to defer removal after the mandate issues, we assume that it is unlikely to preempt the application if it believes that the application has any chance of success.

As described above, we would not ordinarily offer similar relief to petitioners such as Ashot and Vergine Gasparian. However, because they are the parents of a young adult who appears to be a strong candidate for deferred action, the government may well wish to avoid splitting up the family by declining to remove them as well. To ensure that they are not removed before the government has time to consider the question, we also <u>stay the mandate for 90 days as to Ashot and Vergine Gasparian</u>.

<u>It is so ordered</u>.